**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **LEONA RHODES,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:09-CV-1046** |
| | : | |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| **THE  PRUDENTIAL INSURANCE** | : | |
| **COMPANY OF AMERICA,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**OPINION & ORDER**</u>

**I. INTRODUCTION**

This matter is before the Court on Defendant, The Prudential Insurance Company of America's ("Prudential") Motion for Judgment on the Administrative Record (Doc. 14) and on Plaintiff, Leona Rhodes's ("Rhodes") Motion for Judgment on the Administrative Record (Doc. 15.) Pursuant to the Employment Retirement Income Security Act ("ERISA"), Rhodes claims entitlement to long-term disability ("LTD") coverage from the employee welfare plan established by her former employer, Merck-Medco Managed Care, LLC ("Merck"), and funded through a group insurance policy issued by Prudential. Rhodes contends that Prudential wrongfully terminated her LTD benefits. For the reasons set forth below, Prudential's Motion for Judgment on the Administrative Record is **DENIED** and Rhodes' Motion for Judgment on the Administrative Record is **DENIED** in part and **GRANTED** in part.

## II. BACKGROUND

### A. Plaintiff's Occupation and ERISA Plan

Rhodes is a fifty-nine year old high school graduate with some college education. She is a former employee of Merck where she worked as a Customer Service Representative. Rhodes's primary duties in this position consisted of collecting information on prescription orders over the phone (PRU000452). Occasionally, however, Rhodes's position required her to lift a maximum of ten pounds (PRU000614).

As an employee of Merck, Rhodes was eligible to apply for LTD benefits through a Prudential insurance plan governed by ERISA (PRU000694-PRU000717).  The Prudential policy ("the Policy") pays LTD benefits when a patient has a long period of "Disability," including either "Total Disability" or "Partial Disability." "Total Disability" exists when the insured cannot perform the material and substantial duties of his or her occupation and is not performing the duties of any other job. Additionally, a finding of "total disability"requires that the insured be under the care of a doctor (PRU0705). "Partial Disability" exists when the insured is working for wage or profit at his or her own occupation or another occupation, but not on a full-time basis, and the insured is seeking continued medical treatment (PRU0705).

### B. Plaintiff's Disability and Application for Benefits

Rhodes has had a history of heart problems since 1993 when she suffered a heart attack (PRU0150). Rhodes's heart problems did not require her to take a leave from work, however, until April 22, 1999 when she suffered a vasodepressor syncope as a result of her cardiac

2

condition. Subsequent to this diagnosis, Prudential approved Rhodes to receive short-term disability ("STD") benefits beginning on April 22, 1999 through May 16, 1999  (PRU0001). Rhodes left work again on or about July 19, 1999 due to a reoccurrence of the syncope (PRU0004). At that time, Prudential renewed her STD benefits through October 18, 1999 (PRU0005). Chest pain caused Rhodes to again leave work on January 20, 2000 (PRU0013). As a result of this condition and a subsequent fibromyalgia diagnosis, Prudential extended Rhodes's STD benefits initially through April 16, 2000 and then again through May 9, 2000. Prudential terminated Rhodes's STD benefits effective May 10, 2000 and initially denied her LTD benefits request because she no longer met the definition of Total Disabilty (PRU0013-14). After Rhodes had to leave work again, however, on June 1, 2000  due to her cardiac and fibromyalgia conditions, Prudential reinstated her STD benefits through August 13, 2000 (PRU0566; PRU0673).

On December 19, 2000, Prudential notified Rhodes that, given her totally disabled status, it had approved her request for LTD benefits effective November 28, 2000 (PRU0669-670). This notification also explained Prudential would review its LTD benefits decision after twenty-four months of payments to determine if Rhodes was unable to perform the duties of "any gainful occupation" for which she is reasonably qualified because of the "same sickness or injury" (*Id*.).

### C. Plaintiff's Continued Medical Treatment

On February 14, 2002, during her initial twenty-four month benefits period, Rhodes was admitted to the hospital because she was experiencing chest pains rating at the maximum ten level on a pain scale (PRU0341). On February 19, 2002, an emergency room physician, Dr. Alaa

Ujayh, diagnosed her as having chronic pain syndrome secondary to fibromyalgia and prescribed

methadone in addition to a pain treatment program (PRU0343). In May 2002, Rhodes had a

physical therapy session in which it was noted she had a slow gait and symptoms of generalized

pain that prevented her from doing housework and getting dressed (PRU0397-99). On July 24,

2002, Rhodes visited Dr. Robert J. Masone who diagnosed her as having "diffuse muscle pain,"

reinstated her methadone prescription, and recommended regular physical therapy (PRU0402-

03).  On August 21, 2002, Dr. Masone noted that Rhodes's condition had improved and that her

pain was responding to the methadone prescription (PRU0404). On October 2, 2002, Dr. Masone

opined that Rhodes's fibromyalgia condition might be causing her pain and recommended she

continue methadone treatment (PRU0405). During a December 11, 2002 visit,  Dr. Masone

prescribed an increased dosage of methadone because he observed that Rhodes's pain may be

worse during the winter months (PRU0406). Rhodes visited Dr. Masone again on January 22,

2003 and his diagnosis remained the same and he again prescribed methadone (PRU0407).

During a March 5, 2003 appointment, Masone noted that Rhodes was incapable of any

gainful employment (*Id.*).  Further, Dr. Masone diagnosed Rhodes as suffering from myositis

and myofascial pain and found that, though she was stable, she should continue taking

methadone and Neurontin (PRU0208).

On March 19, 2003, Rhodes visited the offices of Dr. Bruce Auerbach, a cardiologist to

whom she was referred by Dr. Byron Blake, one of her regular treating physicians. During this

visit, Dr. Auerbach's physician's assistant, John Scanlan ("Scanlan") diagnosed her as having

atherosclerotic heart disease with a severe ischematic caridomyopathy, but noted she was, "doing

well from a cardiovascular standpoint." Dr. Auerbach agreed with Scanlan's assessment and

tentatively concluded that Rhodes was disabled secondary to the ischemic cardiomyopathy and the term of the disability could be life-long, but would at least last for the next six months (PRU0158).  On June 5, 2003, Rhodes again visited Scanlan, and he concluded that Rhodes's cardiac status was normal (PRU0160).

On November 17, 2003, Rhodes underwent a voluntary Functional Capacity Evaluation ("FCE") at a rehabilitation center. Physical therapist, Aimee Fairman, and Occupational Therapist, Kathleen Fox, examined Rhodes. Based on this examination, they concluded that Rhodes was capable of "sedentary work" and that she could exert up to ten pounds of force occasionally and/or a negligible amount of force frequently" (PRU0304).

On March 18, 2004, Rhodes returned to see Scanlan for her yearly check-up and Dr. Auerbach reviewed his assessment. Scanlan concluded that Rhodes was doing well from a cardiovascular standpoint and did not find her reported shortness of breath to be an area for concern. To confirm this diagnosis, Scanlan suggested Rhodes undergo routine cardiac tests (PRU0161). On April 8, 2004, Rhodes underwent cardiac testing with Dr. Ken Baker. Stress imaging showed a severe defect of her anteroapical uptake and a myocardial perfusion consistent with infraction of the anteroapical wall (PRU0163). After a follow-up visit on April 23, 2004, Dr. Auerbach declared Rhodes to be "clinically stable"(PRU0164).

On May 4, 2004, Dr. Blake wrote a letter stating that Ms. Rhodes was "[u]nemployable in her total and permanent physical and emotional disability" and that "[t]his situation has existed for years with no change" (PRU0198). Also in May 2004, Rhodes had an initial visit with pain specialist, Dr. Brian F. Griffin, who concluded she was not yet ready for employment and recommended she continue taking pain medication (PRU0207). After a September 16, 2004

follow-up visit, Dr. Griffin found Rhodes's pain had progressed and questioned the findings of an FCE she had undergone which stated her heart rate did not correlate with her reported level of pain. He deferred assigning Rhodes pain intervention procedures until after her pacemaker implantation (PRU0212).

On September 21, 2004, Dr. Auerbach performed a procedure on Rhodes to implant a pacemaker. The following day Rhodes visited the emergency room because of complications and pain associated with the pacemaker (PRU0170). Rhodes entered the hospital again from March 17, 2005 to March 22, 2005 because she was presenting symptoms consistent with acute coronary syndrome and she underwent a cardiac catheterization (PRU0148). Scanlan wrote a letter dated March 30, 2005 which indicated that Rhodes's combination of cardiac problems made it "impossible for her to work" and that she had been disabled since her first visit to their office in March 2000 (PRU0150). During an April 15, 2005  visit, Scanlan concluded Rhodes should go to the emergency room because of his concern that she was suffering from profound anemia (PRU0151). An April 19, 2005 emergency room report indicated that Rhodes was suffering from rectal bleeding and the attending physician diagnosed her with hypoprothrombinemia secondary to her heart medication (PRU0176). In a follow-up visit on June 3, 2005, Dr. Auerbach noted that though her condition had improved, Rhodes was still experiencing severe bruising as a result of her cardiac drug therapy (PRU0177).

On January 13, 2006, Dr. Blake wrote another letter stating that Rhodes's long history of cardiovascular disability prevented her from driving or using public transportation and rendered her totally and permanently disabled and unemployable (PRU0200).On April 21, 2006, Steven S. Rosenthal conducted a Physical Capacities Evaluation of Rhodes. In his evaluation, he observed

6

that Rhodes could sit for four hours at a time and lift up to twenty pounds. Additionally, he noted that she was unable to manage simple grasping, pushing, and pulling. Rosenthal concluded Rhodes could not drive (PRU0253-54). On May 2, 2006, Rosenthal also conducted a vocational evaluation based on a March 22, 2006 visit he had with Rhodes.  He concluded that based on his vocational probability assessment, Rhodes was incapable of sustaining full-time employment in the foreseeable future (PRU0455).

On January 10, 2007, Rhodes again visited the hospital overnight due to chest pain and her ischemic cardiomyopathy condition (PRU0153). Following this hospital visit, on January 16, 2007, Rhodes underwent a cardiac stress test (PRU0183). Dr. Auerbach found that the results of the stress test demonstrated abnormalities that were evidence of ischemia and decided to perform a cardiac catheterization (PRU0152). Rhodes was again admitted to the hospital on January 22, 2007 and was diagnosed with atherosclerotic heart disease, ischemic cardiomyopathy, and fibromyalgia. On February 2, 2007, however, Dr. Auerbach noted that Rhodes was still doing well from a cardiovascular standpoint and was clinically stable (PRU0187).

On April 9, 2007, Rhodes suffered a subdural hematoma and an intracranial bleed (PRU0189). In follow-up visit with Scanlan on April 30, 2007, he noted that Rhodes was still doing well and was considered stable, but there was some concern that she was not taking her Coumadin drug therapy due to her recent subdural bleed (PRU0193–194).

In September 2007, Rhodes was evaluated for neuropsychological conditions. At that time, Dr. Katz noted that he had been seeing her since June 2007. During the September visit, he diagnosed her with Post Concussive Disorder, Post Traumatic Affective Disorder and Chronic

Pain Syndrome. (PRU0249). On November 6, 2008, Dr. Blake reiterated his earlier finding that Rhodes had been totally and permanently disabled since 2000 (*Id.*).

### D. Termination of Benefits and Appeals

On four different occasions from November 14, 2001 through May 29, 2002, Prudential asked Rhodes to submit additional medical records; Prudential claims never to have received a response to these requests (PRU0655). On June 24, 2002, Prudential, citing a lack of medical documentation, terminated Ms. Rhodes's LTD benefits effective July 1, 2002 (*Id.*; PRU0657-668).

On February 24, 2003, Prudential upheld their original termination decision because they found that the additional medical records Rhodes had submitted on July 22, 2002 did not support a finding of disability that would prevent her from performing the "sedentary" tasks of her job (PRU0648). Thus, Prudential denied Rhodes's first appeal of the termination decision.

On May 28, 2003, Prudential issued a response to Rhodes's second request for reconsideration of the termination decision. In upholding their termination decision for a second time, Prudential reviewed additional records Rhodes submitted as evidence of her total disability. Prudential found that Rhodes's medical record did not demonstrate she suffered from a sickness or injury that would render her unable to perform the "material and substantial" duties of her sedentary regular occupation. At this time, Prudential informed Rhodes of her right to file a third appeal (PRU0641).

On May 3, 2007, Rhodes filed a lawsuit against Prudential seeking relief from Prudential's denial of her LTD benefits. *See Rhodes v. Prudential*, 2:07-CV-00390-GCS-TPK.

Rhodes, however, filed a Notice of Voluntary Dismissal of the lawsuit without prejudice on May 30, 2007 because she had not exhausted her administrative appeals (Doc. 14, p.4).

On September 6, 2007, Rhodes notified Prudential of her intention to file a third appeal (PRU0636). On September 9, 2009, Rhodes and Prudential agreed to extend the review period beyond the applicable 90-day time period, giving Prudential until October 9, 2009 to make an appeals decision (PRU0618). Prudential denied Rhodes's third and final appeal on October 23, 2009. For this third and final review, Prudential enlisted several specialists to review Rhodes's file, which included additional records Rhodes submitted for considering for the third appeal (PRU0611). Specifically, Prudential conducted independent medical reviews of Rhodes's cardiac, rheumatological, neuropsychological, and psychiatric health (PRU0611-614). The cardiac specialist, Dr. Diane Zwicke, concluded that Rhodes had suffered from cardiac functional impairment from July 1, 2002 to the time of the review on July 23, 2009 and that these impairments restricted her to the workload categories of "light to sedentary" on a permanent basis (PRU0060;PRU0611). Dr. Zwicke noted, however, that Rhodes had no specific standing or walking restrictions (PRU0060). Additionally, Dr. Zwicke found there were no cardiac findings to explain Rhodes's reported chronic pain and fatigue syndrome (PRU0061). On August 31, 2009, Dr. Zwicke reviewed a new letter Rhodes had submitted from Dr. Bushkar, Rhodes's new general physician. In his letter, Dr. Bushkar opined that Rhodes was "permanently disabled from any type of employment" (PRU0047). Zwikes, however, concluded that no medical documentation on the record supported this finding. Thus, she maintained her finding that Rhodes was not disabled (PRU0048).

Similarly, Dr. Paul Howard, a rheumotology specialist, noted that though Rhodes suffered from fibromyalgia, there was no evidence of any physical examination demonstrating abnormalities as a result of this condition from a rheumotology standpoint (PRU0069). Dr. Howard opined that Rhodes had no restrictions on sitting, walking or reaching based on his review of her record, and he did not think she was suffering from any significant adverse side effects as a result of her medication (PRU0070-71).

The clinical neuropsychological specialist, Dr. J. Robert Yohman, Ph.D., reviewed Rhodes's raw data score results from a 2007 neuropsychological test Rhodes underwent with Dr. Katz (PRU0076). Dr. Yohman found that "there was no consistent, valid objective evidence that Rhodes experienced any cognitive impairments." (PRU0079). Dr. Yohman found Katz's exam to be incomplete because he did not conduct any symptom validity or effort tests, which prevented valid interpretation of the few scores Katz claimed indicated impairment (PRU0081). Additionally, Prudential enlisted the review of a psychiatric specialist, Dr. Marcus J. Goldman (PRU0101-07). Dr. Goldman found that nothing in the record indicated Rhodes had impairments preventing her completion of daily living activities (PRU0614).

Based on these specialists' reviews of Rhodes's file, Prudential concluded that her record did not support a finding that she suffered from any significant cognitive, physical or psychiatric defects effective July 1, 2002 through July 2009 that would render her disabled. Prudential, therefore, confirmed their termination of Rhodes's LTD benefits and denied her third appeal (PRU0610-14).

### III. STANDARD OF REVIEW

Under ERISA, a civil action may be brought by a participant or beneficiary of a disability benefits plan "to recover benefits due him [or her] under the terms of his [or her] plan, to enforce his [or her] rights under the terms of the plan, or to clarify his [or her] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).  In reviewing a claim for alleged wrongful denial of benefits, the district court must base its decision solely upon the underlying administrative record. Evidence that was not presented to the plan administrator cannot be considered by the court. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir.1998).

District courts review a plan administrator's denial of ERISA benefits de novo, unless, as is the case here, the benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  *Wilkins*, 150 F.3d at 613 (6th Cir. 1998) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). When such discretion exists, courts review a plan administrator's decision to terminate benefits using the highly deferential arbitrary and capricious standard of review. *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir.1996). "This standard 'is the least demanding form of judicial review of administrative action.... When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious.'" *Evans v. Unum Provident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006)  (quoting *Perry v. United Food & Workers Dist. Unions 445 & 442*, 64 F.3d 238, 241 (6th Cir.1995)). This deferential standard, however, is not a simple formality: "the arbitrary and capricious standard ... does not require [the Court] merely to rubber stamp the administrator's decision." *Jones v. Metropolitan*

11

*Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004). Instead, a plan administrator's decision will only be "upheld if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Baker v. United Mine Workers of America Health & Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991). This requires the reviewing court to weigh "the quality and quantity of the medical evidence and the opinions on both sides of the issues." *McDonald v. Western Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2006).

## IV. LAW AND ANALYSIS

Prudential denied Rhodes's request for continued LTD benefits based on its determination that Rhodes was no longer disabled. Prudential argues this determination should be affirmed because its determination was not arbitrary or capricious. Rhodes argues that Prudential's determination that she was not disabled and the company's subsequent termination of her LTD benefits was arbitrary and capricious because Prudential: (1) provided no competent medical evidence to support the LTD benefits termination; and (2) denied her appeal without a full and fair administration of her claim.

### A. Treating Physicians' Opinions

In finding that Rhodes was not suffering from a functional impairment that rendered her disabled, Prudential's plan administrator contradicted the views of several of Rhodes's treating physicians who did find that she was permanently disabled and incapable of full-time employment. Beginning in 2000, Dr. Blake found that she was incapable of working and prevented from performing all work duties (PRU0019). Dr. Powers confirmed this diagnosis that Rhodes was unable to work on December 12, 2000 (PRU0244). On December 12, 2001, Dr.

12

Auerbach, the cardiologist to whom Dr. Blake referred Rhodes, also confirmed she was incapable of performing work (PRU0511). On March 3, 2003, after Prudential had already made its initial LTD benefits determination decision, Dr. Masone, her pain management specialist, diagnosed Rhodes as being incapable of any gainful employment (PRU0424). Dr. Masone reiterated this diagnosis that Rhodes was not ready for employment on June 25, 2003 (PRU0208). On May 4, 2004, Dr. Blake confirmed his assessment that Rhodes was unemployable because of her "total and permanent physical and emotional disability" (PRU0216).

On March 30, 2005, Dr. Auerbach's physician assistant, John Scanlan, noted that Rhodes was unable to work because of the "combination of her cardiac problems" (PRU0150). Dr. Blake affirmed his diagnosis that Rhodes's cardiac problems along with her chronic pain symptoms rendered her totally disabled and unemployable (PRU0200).  Dr. Blake also completed a Physical Capacity Evaluation on April 21, 2006 in which he found that Rhodes could only sit for up to four hours at a time and was unable to stand or walk during an eight-hour workday (PRU0253). Dr. Blake confirmed this diagnosis again on November 6, 2008 in which he stated that Rhodes was still "totally and permanently disabled" as a result of "multiple disabling problems" (PRU0251).

Similarly, on July 30, 2009, Dr. Bushkar, Rhodes's new treating physician in Roanoke, Virginia, opined that "she is permanently disabled from any employment"(PRU0083). Each of Rhodes's treating physicians who examined her during the time period from her initial disability to Prudential's review of her third appeal, therefore, individually commented at least once over this seven-year period that she was disabled and unemployable as a result of her disability.

13

In the letter in which Prudential denied Rhodes's final appeal of their termination decision, the senior appeals analyst contradicted these treating physicians' opinions in finding that Rhodes, though disabled, was capable of working full-time (PRU0611). When a plan administrator decides to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision is not arbitrary and capricious if it would be possible to offer a reasoned explanation for the decision based upon the evidence. *Evans v. UnumProvident Corp*, 434 F.3d at 877 (citing *McDonald*, 347 F.3d at 169). Thus, while a plan administrator has no discrete burden of explanation when he credits reliable evidence that conflicts with a treating physician's evaluation, the administrator may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. *Id* at 169. Further, when the alternative medical opinions relied upon are from a file review conducted in place of a physical examination, especially when the plan provides for the right to conduct a physical examination, this Circuit has found such a decision to raise questions about the thoroughness and accuracy of a benefits determination. *Id*. at 877 (citing *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296). The usefulness of an independent medical examination under particular circumstances, therefore, constitutes another element in the equation of  reasonableness of the insurer's termination decision. *Id*.

Prudential's plan administrator relied on four independent medical reviews explicitly when making his final determination regarding Rhodes's LTD benefits (PRU0610-615). All four specialists Prudential hired reached their opinions regarding Rhodes's condition based solely on the medical records she provided and without a physical examination, even though the Plan gives Prudential the right to conduct a physical examination during the claims process

14

(PRU0614;PRU000715). Thus, although Prudential's reliance on the file review does not dispositively show its decision to deny Rhodes her benefits was arbitrary and capricious, this reliance does raise questions about the thoroughness and accuracy of Prudential's benefits termination.

In *Calvert*, the Sixth Circuit found a file review "clearly inadequate" because the reviewer's conclusions ran counter to objectively verifiable determinations of the insured's treating physicians. Similarly, in this case, Dr. Zwicke, the cardiology specialist, and Dr. Howard, the rheumotology specialist, hardly mention in their reviews the opinions of several of Rhodes's treating physicians who attested that she was permanently and totally disabled over the entire time period in question. Though both Dr. Zwicke and Dr. Howard cite the documents containing these opinions as part of the record they considered in reaching their conclusions, neither explains why their opinions differ from those of Rhodes's treating physicians regarding her disability status. Dr. Zwicke concluded that Rhodes was capable of sedentary work from a cardiac perspective, but did not explain how Dr. Blake and Dr. Auerbach, both of whom commented on the cardiovascular restrictions she faced, could have objectively reached different conclusions regarding her work capacity. Further, despite these contradictory conclusions, Dr. Zwicke did not request nor did Prudential require her to conduct a physical exam of Rhodes, though the LTD benefits plan gave them the discretion to do so. Rather, in its final termination decision, Prudential fully adopted Dr. Zwicke's opinion--based on a file review--that Rhodes was capable of sedentary work (PRU0611-12). Similarly, Dr. Howard's opinion references only Rhodes's physicians who conducted a tender point test, but does not cite Dr. Blake or Dr. Masone's assessments of Rhodes's disability status stemming from her chronic pain (PRU0069-

15

72). Without considering these treating physicians' opinions, Prudential's termination decision, like that of the insurer in *Calvert*, was insufficient.

In addition, the record indicates Prudential failed to consider how the combination of Rhodes's cardiac condition and her chronic pain and fibromyalgia symptoms might interact to render her incapable of performing the duties necessary to work at a full-time sedentary position. Though this Circuit has not ruled specifically on how an insurer must address a combination of conditions, other courts have found that when a claimant's treating physicians have found that the interaction of several conditions is the cause her disability, the insurer cannot simply divide the claimant's condition into discrete parts and argue that no evidence for any single ailment supports a disability finding. *See Rodgers v. Metro. Life Ins.*, 655 F. Supp. 2d 1081, 1088 (N.D. Cal. 2009) (concluding that an insurer could not arbitrarily refuse to credit treating physicians' opinions that adopted a holistic approach to find a combination of symptoms from various ailments prevented an employee from returning to work). *See also Bladowski v. Prudential Ins. Co.*, 2010 U.S. Dist. LEXIS 120103, at *25 (E.D. Mich. November 12, 2010) (finding that if treating physicians determine a patient is suffering from several disabilities, an adequate file review cannot ignore these multiple conditions) .

In this case, two of Rhodes's treating physicians found that the combination of her cardiac and pain symptoms together rendered her disabled. Dr. Blake in particular, Rhodes's longest treating physician, twice wrote letters explaining how the combination of her conditions led him to conclude that she was permanently disabled (PRU0216;PRU0251). Though Prudential instructed its independent file reviewers to consider Rhodes's possible functional impairments stemming from "one condition or a combination of conditions," neither Dr. Zwicke's nor

16

Dr. Howard's opinions suggest they heeded the latter instruction. Both physicians reference that they spoke to each other about Rhodes's medical history; however, neither of their analyses reflects a consideration of how her cardiac and chronic pain conditions might interact in a way to render her disabled even if, individually, neither diagnosis would cause total disability. Thus, by ignoring the possibility that a combination of Rhodes's conditions could provide objective evidence of her total disability, Prudential failed to conduct a sufficient review of her medical history in making their LTD benefits termination decision.

## V. CONCLUSION

For the foregoing reasons, this Court remands this case to the plan administrator to conduct another review of Rhodes's medical history and make a new benefits determination that considers: (1) the opinions of her treating physicians who found she was totally disabled; and (2) whether Rhodes's cardiac and rheumotology conditions combined might render her disabled. Based on this conclusion, the Court therefore **DENIES** the Defendant's Motion for Judgment on the Administrative Record and **GRANTS** in part and **DENIES** in part the Plaintiff's Motion for Judgment on the Administrative Record.

**IT IS SO ORDERED**.

 **s/Algenon L. Marbley**
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT COURT**

**Dated: December 6, 2010**

17